# In the United States Bankruptcy Court
## for the
## Southern District of Georgia
### Savannah Division

FILED
Lucinda B. Rauback, Clerk
United States Bankruptcy Court
Savannah, Georgia
By dreese at 4:53 pm, Dec 30, 2014

In the matter of: )
)
HUTCH HOLDINGS, INC., ) Chapter 11 Case
)
       *Debtor.* ) Number 13-42241-EJC
)

## OPINION AND ORDER DENYING MOTION FOR RELIEF FROM STAY

This case is before the Court on the Motion for Relief from Stay ("Motion") (dckt. 42) filed by Federal Deposit Insurance Corporation as Receiver for First National Bank ("FDIC"). The subject of the Motion is one of the debtor's three real estate holdings, the Newsouth Building in Augusta, Georgia ("Newsouth"). The narrow issue presented is whether Newsouth "is not necessary to an effective reorganization" within the meaning of 11 U.S.C. § 362(d)(2)(B). Having found that Newsouth is necessary to an effective reorganization, the Court will deny the Motion.

I.     JURISDICTION

This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1334(a), 28 U.S.C. § 157(a), and the Standing Order of Reference signed by Chief Judge Anthony A. Alaimo on July 13, 1984. This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(G) (providing that core proceedings include "motions to terminate, annul, or modify the automatic stay"). In accordance with Rule 7052 of the Federal Rules of Bankruptcy

AO 72A
(Rev. 8/82)

Procedure, the Court makes the following findings of fact and conclusions of law.

II. FINDINGS OF FACT

The Court held an evidentiary hearing on November 18, 2014, at which the Court heard testimony from Michael J. Kistler ("Kistler"), the sole shareholder of Hutch Holdings, Inc. ("Hutch Holdings" or "Debtor"); David Pelliccione, C.P.A., Hutch Holdings' accountant for about twenty-three years; and Thomas W. Jones, C.P.A., who was retained by FDIC to review the financial records of Debtor. The parties also filed a joint stipulation of facts. (Dckt. 133.)

A. Procedural Background

Hutch Holdings filed its Chapter 11 petition on December 3, 2013. (Dckt. 1.) As will be more fully discussed below, Debtor's schedules reflect that it owns real property (either directly or indirectly) consisting of Newsouth, fifteen office condominiums in Savannah, Georgia ("Executive Circle"), and an apartment complex in Griffin, Georgia (by virtue of a ninety-nine percent interest it holds in DAI Versailles, LLC ("Versailles")). Its only other assets are bank account balances and some receivables. (Dckt. 132, at 3.)

FDIC is one of Debtor's principal creditors, holding a first lien on its most valuable asset, Newsouth. FDIC filed its Motion for Adequate Protection as to Cash Collateral, or, in the Alternative, for Relief from Stay (dckt. 28) on January 24, 2014. Debtor and FDIC entered into a consent interim cash collateral order by which Debtor was allowed

to use rent proceeds from Newsouth for certain budgeted expenses and was required to remit the remaining revenues to FDIC. (Dckt. 33.)

On April 1, 2014, Debtor filed a motion to increase its exclusivity period under 11 U.S.C. § 1121(b) for filing a plan, seeking a sixty-day extension through May 31, 2014 (dckt. 36), and that matter was scheduled for hearing on April 29, 2014. (Dckt. 37.) On April 21, 2014, FDIC filed its Motion For Relief From Stay (dckt. 42), which is now pending before the Court. On April 22, 2014, Debtor filed its plan and disclosure statement. (Dckts. 43–44). At the April 29, 2014 hearing on extending the exclusivity period, FDIC did not appear because it considered that motion moot. After hearing argument from Debtor's counsel regarding why the motion was not moot and a proffer on the grounds for such extension, the Court granted the extension through April 22, 2014. (Dckt. 54.)

On April 25, 2014, the Court issued its Order and Notice of Hearing on Disclosure Statement and Determination of Secured Status and Valuation of Assets (dckt. 50), scheduling a hearing for June 23, 2014 and setting a deadline of June 2, 2014 for parties in interest to object to the disclosure statement and the valuation of assets. On June 2, 2014, FDIC filed a written objection to Debtor's disclosure statement. (Dckt. 67.) Relevant here, FDIC objected to Debtor's $2.85 million valuation of Newsouth, contending that the true value was $1.95 million.

The Court held an evidentiary hearing to establish the value of Newsouth on

June 17, 2014 and announced its findings of fact on that issue at the start of the hearing on June 23, 2014. The Court determined that the value of Newsouth is $2.1 million. At the June 23 hearing on the disclosure statement, the Court heard argument from counsel regarding certain deficiencies in the disclosure statement relating to financial reports, the basis for Debtor's estimates of operating expenses, and the circumstances under which Debtor was likely to realize income from its interest in Versailles. Without issuing a formal scheduling order, the Court gave the parties sixty days to complete discovery on issues relating to the adequacy of the disclosure statement and regarding the stay relief issue of whether Newsouth was necessary for an effective reorganization. The Court held the continued hearing on stay relief on November 18, 2014, and the matter was taken under advisement. The parties were asked to submit proposed findings of fact and conclusions of law by December 5, 2014, which both Debtor and FDIC did.

B.  Assets and Cash Flow of Hutch Holdings

Hutch Holdings is a Georgia corporation formed by Kistler around 1990 for the purpose of holding real estate investments. Hutch Holdings elected to be a Subchapter S corporation under the Internal Revenue Code. Although Hutch Holdings has been used as a vehicle to acquire and develop various real estate properties over the years, its existing portfolio of assets as of the filing of this case consists of the three assets discussed below.

1.  *Newsouth Building in Augusta, Georgia*

This 45,148 (38,966 rented) square foot, four-story professional office building

built in 1970 is located at 360 Bay Street in downtown Augusta, Georgia and was acquired by Hutch Holdings on December 30, 1992. (FDIC Ex. A.) This property generates revenues of approximately $460,000.00 per year and net operating income of $194,000.00 per year. The Court determined that the property's value is $2.1 million.

The cash flow from this property was summarized by FDIC's expert witness, Thomas W. Jones, as follows:

|  | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| Net Rental Income | $142,382 | $127,805 | $137,388 | $118,147 |
| Add-Back Depreciation | $22,442 | $21,930 | $21,927 | $21,926 |
| Net Annual Cash Flow | $164,824 | $149,735 | $159,315 | $140,073 |

For the period analyzed, 2013 had the highest annual net cash flow, averaging about $13,735.33 per month. (FDIC Ex. CC.) That amount is more than the proposed monthly plan payment to FDIC of $10,522.00. (Dckt. 44, at 22.)

2. *Executive Circle in Savannah, Georgia*

On April 10, 1992, Hutch Holdings acquired Units 1 through 5 and 11 through 14 of a condominium/office complex (identified as the "Abercorn Executive Park Annex Subdivision" in the property descriptions) from the Resolution Trust Corporation. (FDIC Ex. C.) Hutch Holdings acquired Units 6 through 10 of this same complex in August 1992 from The Coastal Bank, and Unit 15 in December 1993 from Walter Sterno. (FDIC Exs. B–D.) These properties are managed separately from Newsouth. Kistler estimates that the value of

all units totals $600,000.00. (Dckt. 133, ¶ 19.)

The cash flow from the Executive Circle property was also summarized by Jones as follows:

|  | 2013 | 2012 | 2011 | 2010 |
|---|---|---|---|---|
| Net Rental Income | $42,444 | $24,679 | $26,670 | $36,133 |
| Add-Back Depreciation | $8,181 | $7,818 | $7,509 | $7,510 |
| Net Annual Cash Flow | $50,625 | $32,497 | $34,179 | $43,643 |

For the period analyzed, 2013 had the highest annual net cash flow, averaging about $4,218.75 per month. (FDIC Ex. CC.) That amount is *less* than the proposed monthly plan payment to The Coastal Bank of $6,816.90. (Dckt. 44, at 22.)

3. *DAI Versailles, LLC*

Hutch Holdings owns a ninety-nine percent interest in an entity known as DAI Versailles, LLC. The remaining one-percent interest is owned by Development Associates, Inc. of which Kistler is also the sole shareholder. Versailles owns an apartment complex in Griffin, Georgia which was conveyed to a third party under a financing arrangement that included a wraparound mortgage. This mortgage grants equitable title to an entity controlled by John James, the property's manager, while Versailles retains legal title. Under the terms of this arrangement, Versailles receives annual payments of approximately $30,000.00 to $35,000.00 as option extension payments. When the option comes due in April 2017, Kistler testified that he expects that the option will be exercised and that Versailles will receive a net

payment of approximately $560,000.00.[1] In the event the option is not exercised, full title to the property will revert to Versailles with significant equity in the property.

C. Origin of Hutch Holdings' Obligation to FDIC

Hutch Holdings granted a deed to secure debt on Newsouth to First National Bank ("FNB") on December 31, 2007. (FDIC Ex. E.) On that same day, Hutch Holdings executed a document titled "Commercial Security Agreement," granting FNB a security interest in Newsouth to support a personal line of credit for Kistler in the amount of $1.5 million. (FDIC Ex. F.) The line of credit was renewed on January 20, 2009. (Dckt. 133, ¶ 10.)

Kistler, along with several other guarantors, also guaranteed a $1 million promissory note from Cobalt Partners, LLC to FNB dated January 3, 2008 ("Cobalt Note"). Kistler and the other guarantors are members of Cobalt Partners, LLC, which was formed to own a bank in Coral Gables, Florida. Because the Commercial Security Agreement discussed above pledged Newsouth for "all present and future debts" of Kistler, it secures Kistler's guarantee of the Cobalt Note. (Dckt. 133, ¶ 11.)

The Cobalt Note eventually went into default as well as the line of credit. FDIC became the successor in interest to FNB after it failed. FDIC obtained a

---

[1] This asset was valued at $500,000.00 in Debtor's schedules as originally filed. (Dckt. 20, at 5.)

$2,552,426.56 judgment against Kistler. (Dckt. 133, ¶ 12.) As a result, although Debtor does not owe money to the FDIC, its most valuable asset, Newsouth, is subject to a lien in its favor.

D.     Origin of Hutch Holdings' Obligations to The Coastal Bank

The existing debt on Executive Circle has an equally complicated history. In 2008, Kistler borrowed $650,000.00 from The Coastal Bank ("Coastal Note") to finance the purchase of First Citizens Bank of Glennville, Georgia. Kistler pledged his stock in the acquiring entity, Citizen Investor, LLC, as collateral for the Coastal Note. The Coastal Note was modified in 2009, then renewed in 2010 in the amount of $626,819.19, and at this point, Hutch Holdings granted a deed to secure debt on Executive Circle as additional collateral for the Coastal Note. In 2012, the principal amount of the Coastal Note was increased to $902,094.67. The purpose of this increase was to allow Kistler to do a workout on a defaulted note of another limited liability company in which he had an interest. The Coastal Bank took Lot 17 of Savannah Park of Commerce as additional collateral. Kistler also pledged his fifty-percent interest in Stephenson Avenue Financial Center, LLC. (Dckt. 133, ¶ 17.)

E.     Proposed Plan of Reorganization

Debtor filed its plan on April 22, 2014, and it has not been amended since. Because of the structure of Hutch Holdings, the plan is a model of simplicity and

proposes the following payments:

| Class | Claim Amount | Plan Terms | Monthly Payment |
|---|---|---|---|
| Administrative | $20,000.00 | In full at confirmation | $0.00 |
| Priority | | | |
| #1: Secured (FDIC) | $2,495,093.46 | 20-year amortization (0.12% interest) | $10,522.00 |
| #2: Secured (The Coastal Bank) | $833,438.32 | Regular contract monthly payment | $6,816.90 |
| #3: General Unsecured | $15,437.94 | In full within 30 days (3% interest) | $0.00 |
| Total: | $3,364,014.72 | | $17,338.90 |

As previously noted, the Court valued FDIC's collateral at $2.1 million, which would presumably either reduce the monthly payment or accelerate its retirement because the current payment is based on a roughly $2.5 million figure. There is some dispute about whether the plan provision providing that FDIC's claim will be paid at the federal judgment interest rate is appropriate, but that confirmation issue is not before the Court. Debtor's stated intention to pay administrative claims (which may be underestimated in light of the stay relief litigation) and general unsecured claims at or shortly after confirmation appears to be achievable because Debtor had about $114,723.76 of cash on hand as of October 31, 2014, even after making adequate protection payments to FDIC. (Dckt. 132, at 3.)

III. CONCLUSIONS OF LAW

The filing of a bankruptcy petition stays "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case

under this title," as well as "any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate." 11 U.S.C. § 362(a)(1), (3). FDIC contends that it is entitled to relief from the stay pursuant to § 362(d)(2), which provides in relevant part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> . . . .
> (2) with respect to a stay of an act against property under subsection (a) of this section, if—
> (A) the debtor does not have an equity in such property; and
> (B) such property is not necessary to an effective reorganization[.]

11 U.S.C. § 362(d)(2). The parties stipulated that Debtor has no equity in Newsouth within the meaning of § 362(d)(2)(A) because FDIC's lien is deemed to be the value of the property. Therefore, the narrow issue in this case is whether stay relief should be granted to FDIC with respect to Newsouth because Newsouth is not *necessary* to an effective reorganization.[2] "Necessary" for purposes of § 362(d)(2)(B) means that the property is "logically required" for the success of the debtor's reorganization or rehabilitation plan. *See In re Guyton*, 518 B.R. 681, 695 (Bankr. S.D. Ga. 2014) (Coleman, J.) (citing *Bank of Newington v. Simmons (In re Simmons)*, 446 B.R. 646, 649 (Bankr. S.D. Ga. 2010) (Davis, J.)). Debtor has the burden to establish that Newsouth is necessary to an effective reorganization. *See* 11 U.S.C. § 362(g)(2).

---

[2] FDIC filed the Partial Withdrawal of Motion For Relief From Stay (dckt. 109) on September 22, 2014 to remove § 362(d)(1) as grounds for stay relief.

In support of its position that Newsouth is not necessary for an effective reorganization, FDIC relies on the Supreme Court's language in *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365 (1988), where Justice Scalia, delivering the opinion of the Court, remarked on the elements of stay relief under § 362(d)(2):

> [Section] 362(d)(2) expressly provides a different standard for relief from a stay "of an act against property," which of course includes taking possession of collateral. It provides that the court shall grant relief "if . . . (A) the debtor does not have an equity in such property [*i.e.*, the creditor is undersecured]; *and* (B) such property is not necessary to an effective reorganization. (Emphasis added.) . . .
>
> . . . Once the movant under § 362(d)(2) establishes that he is an undersecured creditor, it is the burden of the *debtor* to establish that the collateral at issue is "necessary to an effective reorganization." See § 362(g). What this requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization *that is in prospect*. This means, as many lower courts, including the en banc court in this case, have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time.". . .

*Id.* at 375–76. FDIC's counsel has honed in on the word "essential" as perhaps stronger than "necessary."

Debtor's counsel, on the other hand, urges the Court to follow the reasoning of Judge Leif M. Clark in the case of *In re Fields*, 127 B.R. 150 (Bankr. W.D. Tex. 1991):

> The term "necessary" is not defined in the Bankruptcy Code although it appears in a number of sections. *See* 11 U.S.C. §§ 1322(a)(1), 327(b), 330(a)(1) and 503(b)(3). . . .

> . . . .
>
> A simple hypothetical demonstrates how [a literal reading of the term "not necessary"] leads quickly to an absurd result. Consider for example an air line estate which owns airplanes, each financed with a different lender. No one plane is really *necessary*, under a literal reading of that term, but how many planes would have to be lost to stay litigation before the court finally had to draw the line and deny such motions on grounds that the remaining planes were necessary? Applying such a reading to "necessary" would reward impatient creditors, while punishing creditors who, by working with the estate, exercise self-restraint and do not immediately seek relief from the stay. . . .

*Id.* at 151–52.

Similar to the situation in Judge Clark's hypothetical, Debtor has three separate assets that FDIC contends are essentially separate businesses, each of which can stand on its own, or at least could be propped up with Debtor's cash reserves. But the surpluses generated by Newsouth are necessary to an *effective* reorganization because, otherwise, the feasibility of the plan is drawn into serious question. As Judge Clark explained, properties like Newsouth are not the type intended to be removed from the estate through stay relief:

> With this background, we can better appreciate that the term "not necessary" at least contemplates excision of those properties that are peripheral to the debtor's operation. By the same token, however, Congress actually *favors* multi-asset real estate enterprises over the single-asset operation, according to the comments of Representative Edwards, militating against an interpretation of "necessary" that would require a real estate enterprise to in all cases slim down to the fewest number of properties need to repay indebtedness.

*Id.* at 154.

Even if granting stay relief would leave Debtor with some assets around which to reorganize, that result is not consistent with the goals of Chapter 11:

> Implicit in the notion of reorganization is the preservation of the enterprise which sought bankruptcy protection in the first place. It would be harsh and unrealistic indeed to conclude that Section 362(d) mandated dismemberment of the very enterprise which chapter 11 reorganization is designed to preserve.
>
> What is clear from the foregoing is that it will be difficult indeed for any court to draw a bright line to indicate just when a given property is not necessary. Some general principles emerge, however. Certainly, a literal reading of the term must be eschewed as it would lead ineluctably to willy-nilly races to the courthouse. Too, courts should keep in mind the underlying goal of reorganization to, as a general principle at least, preserve the enterprise which sought bankruptcy protection from dismemberment by overeager creditors. It becomes quickly apparent that "necessity" will of necessity be measured against the kind of reorganization contemplated in a given case. Whether property is not necessary will thus turn in large part on the peculiar facts and posture of the case, and will not admit of a hard and fast rule.
>
> . . . .
>
> . . . Income production can be a significant factor in concluding that property is "necessary," not simply because the property in question *produces* income, but more largely because the property *contributes to* the income production process. . . .

*Id.* at 154–55 (footnotes omitted) (citations omitted).

In the case at bar, Debtor seeks to reorganize in order to preserve its entire portfolio of assets. It has proposed a plan that clearly is designed to accomplish that goal. While the current level of cash flow appears sufficient to fund the proposed monthly plan payments, the annual option payments and lump-sum payment of $560,000.00 that Debtor

expects to receive on account of its interest in Versailles provide ample support for Debtor's position that there is "a reasonable possibility of a successful reorganization within a reasonable time." *Timbers*, 484 U.S. at 376. A continued hearing on the disclosure statement will be held on January 8, 2015, and the Court has not yet been presented with any serious impediment to confirmation of Debtor's plan.

The Court is not persuaded that the cases cited by FDIC support or compel the grant of stay relief in this case. First, Debtor quotes the following sentence from the Second Circuit Court of Appeals' decision in *Pegasus Agency, Inc. v. Grammatikakis (In re Pegasus Agency, Inc.)*, 101 F.3d 882 (2d Cir. 1996), as support for the proposition that necessity under § 362(d)(2)(B) is a two-prong test: "To demonstrate 'necessity,' [the debtor] had to show that 'the property is essential for an effective reorganization that is in prospect' and that there is a 'reasonable possibility of a successful reorganization within a reasonable time.'" *Id.* at 886 (quoting *Timbers*, 484 U.S. at 376). Referring to the actual source of the quoted language, however, reveals that there is no such two-prong test for necessity and that the proposed second part of the test merely helps define what the first part means: "What [§ 362(d)(2)(B)] requires is not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect. *This means . . . that there must be a reasonable possibility of a successful reorganization within a reasonable time.*" *Timbers*, 484 U.S. at 375–76 (emphasis added) (internal quotation

marks omitted). Furthermore, what the court in *Pegasus* actually found was that the debtor had failed to carry its burden of persuasion due to deficiencies in its plan of reorganization, which is not the case here. *See Pegaus*, 101 F.3d at 887 ("However, whether or not the bankruptcy court erred in calculating the amount of secured debt, the reorganization plan's unfounded assumptions and dubious calculations rendered it entirely unreliable, and there is, therefore, no prospect of an effective reorganization under any calculation of the debt.").

Next, FDIC cites *Peoples Bank v. Williamson (In re Williamson)*, No. 07-60416, 2008 WL 7400621 (Bankr. S.D. Ga. Mar. 24, 2008) (Davis, J.), for the proposition that Debtor must show more than the fact that retaining Newsouth is "convenient or useful or makes its operations more efficient." (Dckt. 139, at 11.) The Court agrees with FDIC on this point, but Debtor has shown that Newsouth will generate *more* income than it will cost to service FDIC's corresponding debt. Integral to the court's determination that stay relief was proper in *Williamson* was that "[i]n an appropriate cost benefit analysis, the expense of purchasing or financing this equipment, not essential to the core mission and function of the farming operation, simply cannot be justified during a reorganization." *Williamson*, 2008 WL 7400621, at *5. That simply is not the case here.

Furthermore, FDIC's argument that Newsouth is not integral to Debtor's business or reorganization is without merit for the reasons explained in the discussion of

(Rev. 8/82)

15

*In re Fields* above. Oddly and unpersuasively, FDIC argues that the "extra income" that is expected to be generated by the operation of Newsouth is a luxury item like a boat and, therefore, not necessary for Debtor's effective reorganization. (Dckt. 139, at 12 (citing *In re Patti*, No. 98-17719DWS, 1999 WL 223505 (Bankr. E.D. Pa. Apr. 15, 1999).) This argument does not pass the straight-face test. Using the facts from *In re Patti* as an example, the reason why the court found that the boat was not necessary for an effective reorganization was because the debtor's tee shirt selling business could be conducted elsewhere and the debtor failed to establish that his use of the boat was "directly related to the production of income." *Id.* at *4. In this case, Debtor's business *is* operating Newsouth. If Debtor lost Newsouth, this "extra income" could not be generated somewhere else; it is directly related to Debtor's ownership and operation of Newsouth.

ORDER

In accordance with the foregoing findings of fact and conclusions of law, it is

ORDERED that the Motion for Relief from Stay (dckt. 42) filed by FDIC is DENIED.

Dated at Savannah, Georgia, this 30th day of December, 2014.

_____
Edward J. Coleman, III
United States Bankruptcy Judge
Southern District of Georgia